**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Karen C. Han<br><br>　　　　　　Plaintiff,<br><br>　　　　v.<br><br>Financial Supervisory Service, a South<br>Korean Corporation without capital<br>　　　　　　Defendant. | **Civil Action No.**<br><br><br><br><br><br>**JURY TRIAL DEMANDED** |

**COMPLAINT**

Plaintiff Karen C. Han ("Plaintiff" or "Han"), as and for her Complaint against Defendant Financial Supervisory Service, a South Korean Corporation without capital, ("Defendant" or "FSS"), states and alleges as follows:

## NATURE OF THE ACTION

1.　　　This is a diversity action to seek cumulative damages sustained by Plaintiff due to Defendant's continuous acts to intentionally and improperly interfere with Plaintiff's contractual relations with non-parties Hankook Tire Co., Ltd. (currently Hankook Tire & Technology Co., Ltd.) ("Hankook") and its controlling shareholders, Yang-Rae Cho ("Mr. Cho") and Hyun-Bum Cho, Mr. Cho's son (collectively, "Hankook Party"). This case with a long and tortured procedural history presents a prolonged legal strife among the parties in this action and Hankook Party. This long-term struggle among the three parties stems from Plaintiff's inadvertent involvement in Hankook Party's illegal financial activities in offshore tax haven areas.

2.　　　Before providing her and her financial business entity's (Peninsula Asset Management (Cayman) Ltd. ("Peninsula")) service to Hankook Party in raising

1

funds for Hankook Party's investment company in Labuan, Malaysia, a tax haven area, Plaintiff entered into a contract with Hankook Party that contained an indemnity clause or agreement ("Indemnity Agreement"). The indemnity obligations in the Indemnity Agreement would be triggered when "any breach or alleged breach of the laws or regulations of Malaysia, [South] Korea and United States of America" resulted from the transactions Peninsula or Plaintiff performed for Hankook Party in relation to said services. The indemnity obligations included the indemnification for "all losses, liabilities, costs, charges and expenses (including legal fees and expenses)" which Peninsula and Plaintiff may suffer or incur. Afterwards, it was discovered that Plaintiff was fraudulently induced by Hankook Party to perform such services to implement an illegal scheme involving money laundering and insider stock trading for the benefit of Mr. Cho—which were in flagrant breach of South Korean laws or regulations. Plaintiff's business was seriously damaged by Plaintiff's unwitting involvement in the illegal activities of HanKook Party.

3.      Defendant is a civil corporation without capital which operates as a "buffer" between South Korean financial institutions and South Korea's governmental agency (equivalent to U.S.'s SEC). Defendant investigated the offshore financial activities of Hankook Party mentioned above, and found that such activities were in violation of various laws or regulations of South Korea. Nonetheless, Defendant willfully participated in joint activities with Hankook Party to conceal its finding of these violations that would trigger the Indemnity Agreement in order to obstruct Plaintiff's proof of her claim against Hankook Party in legal proceedings.

4.      Defendant was the only independent entity in the jurisdiction of the

United States to which both Plaintiff and Hankook Party could resort for proof of her claim or Hankook Party's defense in legal proceedings. Thus, under the circumstances, Plaintiff's action against Hankook Party could not proceed or even stand if Plaintiff were unable to obtain evidence from Defendant. In this connection, Defendant, out of ill will, induced Hankook Party to breach Indemnity Agreement by assuring Hankook Party that Defendant would not submit in any legal proceedings in the United States any evidence in its possession with which Plaintiff would be able to prove her claim against Hankook Party.

5.      A legal battle spanning for nearly twenty years involving foreign sovereign immunity issue between the parties in this action over Defendant's amenability to discovery process in the United States has been at the center of this long running dispute described above. Defendant's misconduct was on full display when it fraudulently enlisted the South Korean Embassy in Washington D.C. (the "South Korean Embassy") to issue a diplomatic letter stating that Defendant is a government organ of South Korea in order to avoid its obligation to submit evidence that would prove Plaintiff's claim against Hankook Party.

6.      As more fully set forth below, Defendant has engaged and continues to engage in intentional and willful acts calculated to cause damages to Plaintiff, by inducing Hankook Party to breach the Indemnity Agreement. There would not have been a breach of Indemnity Agreement by Hankook Party but for the activities of Defendant. Defendant's continuing misconduct persisted up through the time of filing of this lawsuit. Plaintiff's claim possesses a continuing nature. Accordingly, Plaintiff should be permitted to recover the totality of the harm Plaintiff has suffered during the

entire period in which the Indemnity Agreement has remained breached. As a result of Defendant's tortious interference with the Indemnity Agreement, Plaintiff has suffered damages from the cumulative expenses, including but not limited to legal expenses, and the other continuing harm caused by Defendant's extreme and outrageous conducts alleged in this Complaint that includes intentional infliction of emotional distress. .

7.      As an alternative to the tortious interference claim, Plaintiff asserts prima facie tort claim under New York law. As more fully set forth below, Defendant's acts described above were done solely for an improper or evil motive, and without any justification. Defendant embarked on a deliberate and malicious vendetta against Plaintiff aimed at securing revenge for Plaintiff's bringing to light the pervasive corruption within Defendant's organization.

## PARTIES AND RELEVANT NON-PARTIES

8.      Han is a citizen of the State of Texas. Han was the director and sole shareholder of Peninsula, which is now defunct. Han was the principal plaintiff in a previous action against Hankook Party litigated in the United States District Court for the Northern District of Ohio ("Ohio Litigation") in connection with the cause of action claimed in this action.

9.      FSS is a civil corporation without capital established under the laws of South Korea, with its principal offices located in Seoul, South Korea, which maintains a branch office in New York City.

10.     Non-party No Joon Park ("Park") is the spouse of Han. Park was an additional plaintiff principally related to a fraud-related claim in the Ohio Litigation,

for which the statute of limitations has already expired prior to the filing of this action. Park seeks no relief against FSS in this action. He is included in this Complaint primarily to present factual allegations.

11.    Non-party Hankook is a global corporate conglomerate organized and existing under the laws of South Korea, with its principal offices located in Seongnam-si, South Korea, and has continuously maintained a business establishment in the State of Ohio since 1991. Non-parties Mr. Cho and Hyun-Bum Cho, citizens of South Korea, were, at all times material hereto, the Chairman of the Board and controlling shareholders of Hankook. Hankook and Mr. Cho were defendants in the Ohio Litigation. No relief is sought herein against Hankook, Mr. Cho or Hyun-Bum Cho. They are included in this Complaint primarily to present factual allegations.

## JURISDICTION AND VENUE

12.    The Court has jurisdiction over this matter and the parties pursuant to 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between Plaintiff and Defendant, and the amount in controversy exceeds $75,000.00 exclusive of costs.

13.    This Court has personal jurisdiction over FSS because FSS, maintaining its branch office in New York City, is present in New York and/or because the principal or pivotal site of Han's injury in this action is New York, thereby subjecting itself to the jurisdiction of this Court.

14.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Defendant resides in this judicial district.

## FACTUAL ALLEGATIONS

15.    Plaintiff incorporates by reference the allegations set forth above as if fully set forth herein.

### Hankook Party's Illegal Financial Activities In Offshore Tax Haven Area

16.    The genesis of Plaintiff's claim in the Ohio Litigation concerns Hankook Party's illegal financial activities in an offshore tax haven area in the 1990's. Han, Park and Peninsula were fraudulently induced by Hankook to perform certain services to implement an illegal scheme involving money laundering and insider stock trading for the benefit of Mr. Cho.

17.    In December 1995, Han founded Peninsula to engage in the business of the provision of financial services to world-renowned investment banks in international finance centers. Cho Hung Bank group in South Korea (merged into Shinhan Bank in 2006) sponsored the establishment of Peninsula with a view to acquiring the expertise and client network of Park (initial director of Peninsula) in the global equity derivatives market by providing Peninsula with various forms of assistance, such as supplying office space in Seoul, South Korea, to Peninsula and placing its investment funds in the amount of $20 million under Peninsula's management.

18.    Peninsula specialized and quickly became known as one of the market leaders in the provision of financial services related to structured investments using novel derivatives financial engineering, and Peninsula's clients included industry leaders such as Credit Suisse First Boston, Union Bank of Switzerland, Robert Fleming/Jardine Fleming, ING Barings, Lehman Brothers, Credit Lyonnais and others.

19.    In late 1998, Peninsula was approached and retained by Hankook to act as the agent for Ocean Capital Investment (L) Limited ("Ocean"), an investment fund established by Hankook in Labuan, Malaysia, to raise $28 million in the international market. Hankook advised Peninsula that it was under significant time constraints to raise the funding as part of a refinancing for Hankook's other investment companies formed in Labuan, Malaysia. Hankook also represented to Peninsula that the operations of such offshore investment funds were legitimate business activities of the company. Relying on Hankook's credit and representations, Peninsula fulfilled its contractual duties in accordance with the terms and conditions of the relevant agreements executed between Hankook and Peninsula through Ocean. In addition, Hankook also requested that Peninsula, Park and Han act as Ocean's agents for general purposes because Ocean had no personnel, and from time to time Park and Han performed such agent's role as requested by Hankook.

20.    Pursuant to the agreements with Peninsula, representatives of Hankook directed Peninsula to place $20,000,000 of Zero Coupon Notes due 2003 (the "Ocean Notes") with the Korea Long Term Credit Bank (the "KLTCB") on December 23, 1998, and to also transfer the proceeds to Ocean's United States Dollar account in New York, NY. Peninsula, and Park and Han, as employees or agents of Peninsula, executed these transactions as explicitly instructed by Hankook.

21.    Prior to the transactions described above, Hankook employees represented to Peninsula that the KLTCB was the purchaser of the notes. This representation was false. Unbeknownst to Peninsula at that material point in time, the Ocean Notes were actually acquired by subsidiaries and affiliates of Hankook through

a designated cash trust account, that is, a nominee account, maintained at the KLTCB, in violation of laws and regulations of South Korea governing offshore securities and foreign currency transactions.

22.    Under the Regulations on the Foreign Exchange Management of South Korea (Provision 10-53-5) then effective, South Korean residents who were not eligible institutional investors were allowed to purchase foreign currency-denominated securities only through accounts opened at securities companies in South Korea, which in turn, must report the details of the transactions to authorities. As is the case in the United States, the main objective of this regulation, which must be strictly observed by South Korean residents, is for South Korean authorities to screen for fraudulent overseas transfers of foreign currency disguised as overseas investments.

23.    Peninsula, doing business in the international finance market, had a legal obligation to abide by the applicable selling restrictions imposed by each country's laws and regulations. For example, under applicable laws and regulations of South Korea, Peninsula was not allowed to directly or indirectly offer, sell or deliver any notes in South Korea or to any resident in South Korea, or to others for re-offering or re-sale directly or indirectly in South Korea or to any resident of South Korea, except to eligible investors such as the KLTCB. Due to Hankook's calculated misrepresentations intended to induce Peninsula to enter into certain agreements to provide their services, Peninsula inadvertently violated South Korea's selling restrictions. Hankook used Peninsula to perpetrate a money laundering scheme by which Hankook could obtain its goal: the transfer of $20 million in United States Dollars from South Korea—Hankook's governing jurisdiction—to an overseas

account in New York, NY ("NYC Account"). Once effectively laundered into the NYC Account, the funds could be freely transferred.

24.     In connection with the placement of the Ocean Notes, Peninsula agreed to provide and were paid only for services relating to documentation, administration and settlement of the transactions. Peninsula was not paid for, nor did it provide or agree to provide, any underwriting or sales services on a success basis in connection with the transactions. As such, Peninsula was deceived and used only for the purpose of putting up "a good front" for Hankook by lending its good name and goodwill to the matter, so that Hankook could consummate its fraudulent offshore transactions. Peninsula had no reason to believe that the transactions were illegal and it reasonably relied on representations made by Hankook during the negotiations that ultimately resulted in Peninsula's agreement to provide financial services, as well as the representations and warranties in the relevant contracts and other key documents.

25.     In early 2001, serious scandals involving offshore secret funds started to become widely publicized in South Korea. Rumors began to circulate in South Korea and in Hong Kong, where most of Peninsula's clients were regionally headquartered, that Peninsula had been implicated in serious stock manipulation schemes implemented by illegal offshore funds, and Han, Park and Peninsula's business began to suffer as a result of the rumors.

26.     Finally, it was drawn to Peninsula's attention that the offshore fund for which it acted as an agent on behalf of Hankook, the Ocean fund, had been kept off Hankook's accounting books and record—which means that the Ocean fund was a slush fund (for the benefit of Mr. Cho), and, even more alarmingly, that the

transactions Peninsula performed were actually the process of illegal transfer of foreign currency from South Korea to overseas. Under applicable South Korean laws and regulations at that time, participation in these unlawful acts would subject any parties involved to heavy criminal penalties in that jurisdiction. For example, under Korean Act No. 06746, if the amount involved in the illegal acts exceeds the equivalent of approximately $4 million, then the principal is subject to a minimum of 10 years imprisonment and could receive up to a life sentence.

27.    In November of 2001, as a final warning, the Ministry of Finance and Economy of South Korea ("MOFAE") ordered all South Korean corporations and residents to report any offshore funds under their effective control to the Bank of Korea, and provided a three-month grace period. Supervisory agencies also pressed for voluntary reports and announced their intent to conduct thorough on-the-spot probes after the expiration of the grace period in February of 2002.

28.    Due to these events, Peninsula became concerned about the fact that the transactional records underlying Hankook's unlawful handling of United States Dollars and the illegal offshore fund of Hankook were nearly all in Peninsula's name, and thus Peninsula could be seen as a principal of, or a party to, the illegal transactions. Accordingly, Peninsula repeatedly attempted to contact Hankook to urge the company to issue a voluntary report regarding the transactions. However, the Hankook employee who had worked with Peninsula in connection with the transactions intentionally avoided Peninsula's repeated telephone messages for three days in a row.

29.    In March 2002, having ascertained that neither Hankook nor Mr. Cho

made a voluntary report as required by relevant South Korean laws and regulations, Peninsula was compelled to retain counsel based in Hong Kong which sent a demand letter to Hankook for remedies under the Indemnity Agreement.

30.     Subsequent to the receipt of the demand letter by Hankook, Park had several meetings with representatives of Hankook. In one of such meetings held in May 2002, Park met with Dong Woo Seo ("Seo"), counsel for Hankook, Jong Chul Lee (Chief Financial Officer of Hankook and the person in charge of the secret overseas operations) ("Lee"), and Chang Gyu Moon (a former employee of Hankook) ("Moon"). During the meeting, Lee and Moon confessed to Seo that the overseas paper company held illegal funds on flight overseas and was connected to Mr. Cho personally. The meeting adjourned without any firm conclusion, but Peninsula believed that Seo would advise and persuade Mr. Cho to make a voluntary report about the offshore transactions.

31.     About ten days after the May 2002 meeting with Seo, Park held another meeting with Lee at his office in the Hankook Tire Building in Seoul, South Korea. During this meeting, Lee suddenly changed his previous position and completely denied any breach of laws or regulations by Hankook, and instead attempted to blame and shift all responsibility for the acts of money laundering onto Peninsula and other experts that had been consulted by Hankook. Indeed, during the meeting, Lee flatly rejected Peninsula's sincere and reasonable request for a written stipulation that Hankook did not inform Peninsula that the offshore fund's notes were to be placed with subsidiaries and affiliates of Hankook (in violation of the governing

11

laws and regulations of South Korea). In or around July 2002, Hankook offered through Bae, Kim & Lee, a South Korean law firm representing Hankook, approximately $500,000 for indemnification to Peninsula's South Korean legal counsel, Young-Ki Kwon. However, facing the threat of potential criminal prosecution, Han and Park decided to discontinue Peninsula's business.

32.    In or around August 2002, Hankook made a false report to FSS. Hankook stated in the report that the offshore operations were for the benefit of Hankook, rather than for Mr. Cho personally. However, until that time, the overseas slush funds had been kept off the balance books of Hankook.

33.    As a result of the false report to FSS, on December 24, 2002 the Securities and Futures Commission of South Korea ("SFC") ordered Hankook to reflect the offshore slush funds on its financial statements, and also levied administrative sanctions on Hankook and on Mr. Cho individually, finding that Hankook's offshore financial activities at issue were in violation of various laws and regulations of South Korea.

**Additional Background Facts Leading Up To The Ocean Transactions**

34.    In or around August 1996, Hankook caused the formation of three investment funds in Labuan, Malaysia: Jade Investment (L) Limited ("Jade"), Jahama Investment (L) Limited ("Jahama"), and Ocean.

35.    Hankook formed Jade and Jahama to operate as investment vehicles through which Mr. Cho could trade in shares of stock in Hankook, and formed Ocean

to operate as a holding company for any profits realized from the investments by Mr. Cho through Jade and Jahama.

36.     In or around October 1996, Jade and Jahama raised funding of $41 million by issuing debt instruments backed by Hankook's credit without following all required internal and external procedures, an act which was prohibited under South Korean laws and regulations. Jade and Jahama used these funds to purchase 13.1% of the total outstanding shares of Hankook stock. Also, simultaneously, Mr. Cho and Jade/Jahama entered into financial option transactions in side-letter agreements; the effect of the side agreements was that all gains or losses from the investments in shares of Hankook by Jade and Jahama shall belong to Mr. Cho—a fact that was unknown to Peninsula at the material time, and which was also in violation of South Korean laws and regulations.

37.     Due to the financial crisis which hit South Korea in 1997, in late 1998 the share price of Hankook had dropped to the level of below half of the initial purchase price of October 1996. The fallen share price caused a potentially serious financial problem for Jade and Jahama and ultimately Mr. Cho and Hankook, because it meant that they would not have sufficient funds for repayment of the $41 million in debt coming due in or around October 1999. As a result, Mr. Cho and Hankook were in a desperate, time-sensitive position—they needed to quickly acquire and send United States Dollars in a substantial amount to an overseas account without being detected by South Korean authorities.

38.     As set forth above, as a result of the promises and representations

13

made by Hankook, Peninsula entered into a contract—which included the Indemnity Agreement—effective as of October 11, 1998, for the placement of notes issued by Ocean. Accordingly, as directed by Hankook, Peninsula subsequently provided services in connection with transactions to transfer $20 million to the NYC Account on December 23, 1998.

### Hankook's Stock Price Manipulation Scheme

39.     For Jade and Jahama, and ultimately Mr. Cho, to make a profit after repaying debt and interest at maturity in or around October 1999, the share price of Hankook had to rise substantially within a very short time period.

40.     Although Mr. Cho was required to report to South Korean authorities on the mass holding of Hankook shares by Jade and Jahama, he did not. As prescribed in the relevant provisions of the Securities and Exchange Act of South Korea (Article 200-2, Report on Mass Holding, etc. of Stocks) then effective:

> …any person (excluding those who are prescribed by Presidential Decree) who holds voting stocks of a stock-listed corporation or Association-registered corporation in large quantities shall report the situation of their holdings to the Financial Supervisory Commission and the Stock Exchange.

As further provided by the securities and exchange act described-above, the language regarding "large quantities" refers to cases where the number of voting shares owned by the person himself and all specially-connected persons, in the aggregate, amounts to more than 5% of all outstanding shares of voting stock. Thus, Mr. Cho's violation

was a fraudulent act against the public at large, which was kept in the dark, including existing and potential investors all over the world.

41.    In or around February 1999, in an apparent attempt to boost Hankook's share price for the benefit of Mr. Cho, Hankook purchased 2.98% of Hankook's total outstanding shares as treasury stock.

42.    Similarly, in or around April 1999, in another apparent attempt to artificially boost Hankook's share price for the benefit of Mr. Cho, Hankook's board of directors passed a resolution effecting a stock spilt characterized as a 100% "bonus" stock to all those who would be Hankook shareholders of record as of May 24, 1999. This unprecedented action caused the price for Hankook shares to spike to unparalleled levels.

43.    In May 1999, apparently as a result of the board of director's publicly disclosed decision to issue "bonus" stock, and the directors' other undisclosed decisions to manipulate Hankook's stock, Hankook's share price on the open market rose to its historically highest price. Hankook took advantage of the short-lived spike in price to dispose of the Hankook shares held by Jade and Jahama, which Peninsula believe resulted in a net gain of approximately $25,000,000 on the original 1996 transactions that was immediately transferred by Jade and Jahama to Ocean, and to other offshore entities under Hankook's control.

44.    Hankook's annual financial report for the 2002 accounting year lists the following three investment funds or entities in European tax haven areas as its

major shareholders: Eastern Investment S.A., Snowdon-Mast B.V. and EL 2 S.A. The financial report indicates that each of the three shareholders held 4.9% of Hankook's total outstanding stock, which obviously purported to avoid the 5% reporting requirement (as addressed in paragraph 40 above). Upon information and belief, these three entities in tax haven areas are "other offshore entities under Hankook's control" referenced in paragraph 43 above.

45.    In January 2007, SFC requested FSS to investigate the three offshore entities holding Hankook stock described above. At the request of Eun Soo Ha ("Ha") of FSS, who was in charge of said investigation, Park cooperated with him in the investigation. However, in February 2007, Ha notified Park that the Governor (referring to Jeung-Hyun Yoon ("Yoon"), then Governor of FSS and the Chairman of the Financial Supervisory Commission of South Korea ("FSC")) ordered him to cease the investigation.

46.    A number of major South Korean media outlets such as Shindonga, Hankyoreh, MBC and KBS covered or reported on Hankook's secret offshore funds described above. Most of the reporters involved in the news coverage suspected that some high-level employees of FSS might have conspired with Hankook to cover up the severity of Hankook and Mr. Cho's unlawful acts, such as insider stock trading using offshore funds or forming offshore slush funds that were subject to forfeiture by government. They felt that under the circumstances, FSS was required to report those acts which apparently entailed such severe violations of laws to the Prosecutors' Office, or FSC or SFC. In response to these news reports, FSS—believing that Han

and Park were the source for the media coverage—exhibited utmost hostility toward Han and Park, by, *inter alia*, causing a release of a news report stating that FSS was weighing the possibility of filing criminal charges against them for defamation.

47.    As another example that indicates an extreme level of animosity FSS had against Park and Han since the media coverage addressed above, in fact Park, Han and Peninsula were blacklisted by FSS—which wielded substantial influence over financial institutions—in the financial industry in South Korea. For instance, in or around April 2008, Kwang-Sik Cho, a managing director of Hi Investment & Securities Co., Ltd. ("Hi Investment")—who was Park's former colleague at LG Securities Co., Ltd.—gave Park a job offer to work at Hi Investment. Park accepted the offer. However, about a week after Park's acceptance, Kwang-Sik Cho notified Park that Hi Investment could not but withdraw the job offer because FSS warned the company that FSS would not tolerate Hi Investment's recruiting Park, who had dared to confront and defame FSS. As a result of FSS's apparent intimidation of Hi Investment, Park lost the employment opportunity at Hi Investment. Likewise, because of such retaliatory acts of FSS, it was inconceivable to Han that she could resume her Peninsula business. Han's being unable to get back to investment management business due to FSS's threat described above left her depressed and upset, and manifested in physical symptoms. In addition, owing to FSS's extreme and outrageous conduct such as perpetrating a fraud on courts by fraudulently claiming that FSS, a civil organization, is an organ of South Korean government in legal proceedings in the United States to hamper or delay the resolution of this case, as

alleged in the following paragraphs, Han has continued to feel angry and suffered from significant anxiety throughout this protracted litigation against FSS.

## The Ohio Litigation

48.     On or about September 10, 2002, counsel for Han and Peninsula, this time retained in the United States, sent to Hankook, Mr. Cho and Ocean another demand letter requesting for indemnification based upon the Indemnity Agreement.

49.     On or about September 30, 2002, Hankook sent a response letter to counsel for Han and Peninsula, claiming that neither Hankook nor Mr. Cho breached any laws or regulations of South Korea in connection with the Ocean transactions. Han and Peninsula deemed this response to constitute a breach of the Indemnity Agreement. Accordingly, on or about October 8, 2002, Han and Peninsula filed their complaint against Hankook, Mr. Cho and Ocean in the 153rd Judicial District Court of Tarrant County, Texas, claiming causes of action for breach of contract, fraud, negligent misrepresentation, civil conspiracy and piercing-corporate-veil. On May 14, 2004, this Texas state action was dismissed for lack of personal jurisdiction over defendants.

50.     Subsequently, on June 17, 2004, the Ohio Litigation was instituted by Han, Peninsula and Park against Hankook, Mr. Cho and Ocean, asserting the same claims as in the Texas state action.

51.     Because the Ohio Litigation was essentially premised on the Indemnity Agreement, the outcome of the action hinged upon the proof of breach of laws or

regulations of South Korea in connection with the Ocean transactions. Contrary to the Ohio Litigation plaintiffs' claim, Hankook categorically denied that any relevant services or transactions at issue were in violation of any South Korean laws or regulations. Hankook further asserted that despite its full disclosure concerning the Ocean transactions to FSS, no allegations of impropriety or illegality was made by FSS against Hankook, Mr. Cho or Ocean. Accordingly, both parties' discovery focused on FSS's findings as to the legality of the Ocean transactions.

52.    As such, without obtaining discovery directly from FSS—the only independent person or entity in the jurisdiction of the United States that both parties could resort to for proof of their claims or defenses—concerning violation of laws or regulations of South Korea in connection with the Ocean transactions, the Ohio Litigation could not proceed further because FSS, without any explanations, refused to comply with the Ohio litigation plaintiffs' informal request for its voluntary submission to the Ohio federal court of evidence to confirm such violation although FSS did not dispute that there was such violation that triggered the indemnity obligations of Hakook Party.

## The Contempt Proceeding In This Court

53.    In this connection, on March 22, 2005, the Ohio Litigation plaintiffs served FSS at its New York branch office with a subpoena *duces tecum*, issued from this Court demanding that FSS produce a witness with knowledge of FSS's investigation of Hankook Party as well as responsive documents.

54.    FSS did not dispute that it possessed documents and information that were responsive to the subpoena. Further, FSS did not lodge any written objections to the document requests within 14 days after the subpoena was served, as required by Fed.R.Civ.P. 45(c)(2)(B) then effective (currently Fed.R.Civ.P. 45(d)(2)(B)). On April 14, 2005, FSS filed with this Court a motion to quash the subpoena on several grounds, including that it was entitled to foreign sovereign immunity.

55.    After the deposition of a FSS manager in charge of the New York branch office on immunity-related issues and two hearings before this Court, the Court issued its June 15, 2005, Order, which denied the motion to quash and ordered FSS to proceed and cooperate in the discovery process. In this Order, this Court stated that: "The Second Circuit has held that while there is no specific test for 'organ,' status, the following factors are relevant to the determination: (1) whether the foreign state created the entity for a national purpose; (2) whether the foreign state actively supervises the entity; (3) whether the foreign state requires the hiring of public employees and pays their salaries; (4) whether the entity holds exclusive rights to some right in the [foreign] country; and (5) how the entity is treated under foreign state law. Filler v. Hanvit Bank, 378 F.3d 213, 217 (2d Cir. 2004)…" Applying the Filler test, this Court found that FSS "only met the first factor with any certainty." Accordingly, this Court concluded that FSS was not a government organ of South Korea, and that FSS could not claim sovereign immunity. A correct copy of the June 15, 2005, Order, is attached hereto as **Exhibit A**.

56.    About one week after this Court's discovery order addressed in the

preceding paragraph was entered, Ja-Baik Koo ("Koo") of Korea Depository Insurance Corporation ("KDIC")—who was a former employee of Cho Hung Securities Co., Ltd., which provided Peninsula with office space, and thus knew Park—wanted to meet Park, while Park was in Seoul, South Korea to attend depositions of Hankook Party in the Ohio Litigation. Park met with Koo—along with another former employee of Cho Hung Securities Co., Ltd.—in a coffee shop in Plaza Hotel in Seoul. Koo explained that his boss at KDIC, Si-Ho Park—who previously worked for Hankook, asked him to meet and tell Park that Mr. Cho decided to indemnify the Ohio Litigation plaintiffs for all legal and other expenses they actually incurred excluding their business losses. Thus, Koo wanted to know the total amount of such expenses. Koo added that this message was delivered from Mr. Cho through Woong Bae Na ("Na")—who was the former Minister of MOFAE, Yoon's former superior, and the former president of Hankook. About a week after the meeting at the coffee shop, Koo called and told Park that Mr. Cho withdrew his proposal after Yoon discussed with Na regarding this matter and advised Na that Mr. Cho need not settle the Ohio Litigation since FSS would not submit any evidence abiding by the discovery order.

57.    As Yoon advised Mr. Cho through Na, although the Ohio Litigation plaintiffs continued with their efforts to obtain the routine discovery from FSS, even repeatedly offering to make the process as convenient as possible for FSS by taking the deposition and examining documents at the FSS offices in Seoul, South Korea, rather than in New York, FSS continued to stubbornly defy and refused to even

partially comply with this Court's discovery order. Accordingly, on or about August 25, 2005, the Ohio Litigation plaintiffs filed a motion to hold FSS in contempt for refusing to comply with the discovery order. FSS responded that the confidentiality provisions of South Korea's Act on Establishment of Financial Supervisory Organizations of 1997 (the "Establishment Act") prohibited it from disclosing the requested information. The Ohio Litigation plaintiffs countered that FSS was allowed to disclose the information under South Korea's Official Information Disclosure Act, South Korean equivalent of the Freedom of Information Act of the United States.

58.     Throughout the course of the subpoena and contempt proceedings in this Court, Hankook Party closely monitored these proceedings. Hankook's general counsel residing in New York, Dae-Ki Min, frequently discussed with and was informed by Sung-Soon Jung, Head of FSS's New York office, as to whether FSS would submit evidence to this Court, who then assured Hankook that FSS would defy the subpoena and the discovery order.

59.     On November 10, 2005, this Court entered a Memorandum and Order denying the motion for contempt, a correct copy of which is attached hereto as **Exhibit B**. This Court first determined that Section 35(2) of the Establishment Act was a blanket confidentiality foreign statute that prevented FSS from complying with its discovery order. This Court then held that the relevant balancing test to determine whether to still compel FSS to comply with the order weighed in favor of non-compliance with its order.

60.     In making its decision not to hold FSS in contempt, this Court heavily

22

relied on two letters from the South Korean Embassy: one sent to Department of State of the United States (the "Embassy Diplomatic Letter"), dated September 14, 2005, a correct copy of which is attached hereto as **Exhibit C**, and the other to this Court, dated October 5, 2005, a correct copy of which is attached hereto as **Exhibit D**. The Embassy Diplomatic Letter states in pertinent part that "[i]t is feared that any contempt of court against FSS may bring about some undesirable effect upon the relations between the government of the United States and the government of Republic of Korea."

61.    Having been taken by surprise by the abrupt about-face involvement of the South Korean Embassy because Park was previously officially notified by the Ministry of Foreign Affairs and Trade of South Korea ("MOFAT") and FSC that they could not involve themselves in a civil matter affecting the decision of U.S. courts (correct copies of which notification letters immediately followed by English translations are attached collectively hereto as **Exhibit E**), the Ohio Litigation plaintiffs promptly drew the attention of this Court two days prior to and during the contempt hearing to the possibility that the note of diplomatic protest as designated by FSS' counsel, was issued without proper authority. The Embassy Diplomatic Letter or the note of alleged diplomatic protest on its face, clearly indicated lack of proper authority: there was an indication that the formality and content was so coarse as to doubt whether the letter or note was validly issued in due procedure—in fact the letter was not signed and did not contain the name of the author of the letter. Without hearing from Department of State of the United States, this Court so quickly

concluded that the letter at issue constituted the stated position of South Korean government.

62.    Immediately after this Court issued its Order denying the motion to hold FSS in contempt, the Foreign Relations and Trade Committee of the South Korean National Assembly undertook an investigation into whether the Embassy Diplomatic Letter was issued with proper authorization in accordance with the provisions of the Act on the Appointment and Powers of the Government Delegates and Special Envoys of South Korea, and concluded that it was not, finding that Yoon asked non-MOFAT officials at the South Korean Embassy who were delegated from MOFAE to issue the letter, even without the Minister of MOFAT or the Ambassador to the United States being aware of the issuance of the letter, let alone approving the letter as required by the provisions of the act referenced above. A correct copy of a document, produced during the congressional investigation described above, in Korean language entitled "Background of the Issuance of FSS-related Diplomatic Letter" indicating that the Embassy Diplomatic Letter was issued without reporting to or obtaining an approval from the Minister of MOFAT or the Ambassador to the United States, which Park received from MOFAT through a formal civil petition, immediately followed by English translation, is attached hereto as **<u>Exhibit F</u>**. Furthermore, as detailed below in the following paragraphs, FSS fraudulently enlisted the South Korean Embassy to issue the Embassy Diplomatic Letter.

63.    During the first contempt hearing held on September 6, 2005 before this Court, the following colloquies occurred:

24

Mr. SCHWARTZ (FSS's counsel):…because his superiors in Korea will not allow him to comply with this he (Head of FSS's New York office) has to report to jail? I think that that is overwhelming and the cases that plaintiff's counsel points out where jail was ordered are quite distinguishable.

THE COURT (Baer Jr., J.): Don't worry about that.

MR. SCHWARTZ: Thank you very much, your Honor. My client is apoplectic over it, if you will.

A correct copy of the pertinent portion of transcript of hearing held on September 6, 2005 is attached hereto as **<u>Exhibit G</u>**. (*See id.* at p.4).

64.     Thereafter, on September 14, 2005, employees of FSS and FSS's counsel (the "FSS Delegate") visited Washington, D.C., and the FSS Delegate presented to the South Korean Embassy that the Head of FSS's New York office might be sent to jail; thus "in light of the exigent situation in which the Head of New York Office of FSS might be imprisoned if the New York Court holds FSS in contempt of court[,]" the South Korean Embassy issued the Embassy Diplomatic Letter on that day. (*See* pp.3-4, <u>Exhibit F</u> attached hereto).

65.     Afterwards, during the second contempt hearing held on November 2, 2005, the following dialogue took place:

MR. SCHWARTZ:…And obviously, particularly given the Korean government's view of this matter as evidenced by the letter of September 14th from the Embassy of the Republic of Korea at Washington to the State Department, they take this matter with a great deal of seriousness. It could, as the letter says--

THE COURT (Baer Jr., J.): How did that come out? Did you initiate that?

MR. SCHWARTZ: I did not initiate that, your Honor. I did not initiate that.

A correct copy of the pertinent portion of transcript of hearing held on November 2,

2005 is attached hereto as **Exhibit H**. (*See id*. at p.3). As shown above, FSS fraudulently enlisted the South Korean Embassy to issue the Embassy Diplomatic Letter by telling a lie that the Head of FSS's New York office might be sent to jail—which FSS knew was not true. Moreover, FSS's counsel also made a false representation to this Court that he did not initiate the issuance of the Embassy Diplomatic Letter.

66.     The Ohio Litigation plaintiffs appealed from this Court's Order denying their motion for contempt. FSS cross-appealed from the June 15, 2005, Order, denying its motion to quash subpoena based on foreign sovereign immunity. On January 30, 2007, the Second Circuit Court affirmed this Court's denial of the contempt motion on other grounds, rendering the cross-appeal moot—on the grounds of foreign sovereign immunity, finding with support in the record—that is, the Embassy Diplomatic Letter referenced above that states in relevant part that "FSS [is] a regulatory body of the Republic of Korea equivalent to the combination of the United States Securities and Exchange Commission and the United States Federal Reserve Board…"—that: "As an agency or instrumentality of a foreign state under the FSIA, FSS is immune from the present subpoena." Peninsula Asset Management (Cayman) Ltd. v. Hankook Tire Co., 476 F.3d 140, 144 (2d Cir. 2007). Thus, the Second Circuit Court, in fact, reversed this Court's finding, applying the Filler test, that FSS was not a government organ of South Korea, relying on the Embassy Diplomatic Letter—that FSS fraudulently procured by making a false presentation to the South Korean Embassy—that was not before this Court when it ruled on the foreign sovereign immunity issue.

26

**Dismissal of The Ohio Litigation For Lack of Subject Matter Jurisdiction**

67.     The Ohio Litigation plaintiffs' inability to prove the illegality of the Ocean transactions, mainly due to their failure to obtain discovery from FSS, resulted in the award by the United States District Court for the Northern District of Ohio of summary judgment in favor of Hankook on all claims on October 13, 2006.

68.     The Ohio Litigation plaintiffs appealed from the district court's granting of Hankook's summary judgment motion. The Sixth Circuit Court, *sua sponte*, raised the question of subject matter jurisdiction, and on December 13, 2007, reversed the judgment of the district court and remanded the case for consideration of the need to dismiss for lack of subject matter jurisdiction. Peninsula Asset Management (Cayman) Ltd. v. Hankook Tire Co., 509 F.3d 271 (6th Cir. 2007). The Sixth Circuit Court held that: although Peninsula had its principal place of business in the United States, "[i]t is well established that, under § 1332(a)(2), even if a corporation organized under the laws of a foreign nation maintains its principal place of business in a State, and is considered a citizen of that State, diversity is nonetheless defeated if another alien party is present on the other side of the litigation." Id. (internal quotation marks and citation omitted).

69.     Upon remand from the Sixth Circuit Court, agreeing with the Sixth Circuit Court on the jurisdictional defect, the district court dismissed the Ohio Litigation without prejudice for lack of subject matter jurisdiction on February 1, 2008.

**Change in the Legal Status of FSS in South Korea in 2009**

70.     Unlike the unified organizational structure in most countries, including the United States, the financial supervisory organization in South Korea consists of both public-sector organizations such as FSC and SFC, and a civil-sector organization, that is, FSS. Indeed, one of the directives of the Establishment Act which created FSS and FSC (and SFC) is not to infringe on the autonomy of financial institutions. (Section 2 of the Establishment Act).

71.     In an apparent effort to clarify such directive of the Establishment Act, on January 29, 2009, during the first meeting of the Management Committee for Public Institutions, the South Korean government, acting through MOFAE, announced its decision to release FSS from the designation of "public institution" to secure autonomy and independence of FSS and financial institutions from the government. A correct copy of a news article reporting on the January 29, 2009, policy decision by the South Korean government is attached hereto as **Exhibit I**. Thus, this policy decision transformed FSS from a civil public corporation, which might have caused some confusion in the legal status of FSS, into a pure civil corporation that maintains complete independence from the government or its agencies. Without more, this decision by the South Korean government leaves no room for any doubt that FSS is not a government organ of South Korea.

72.     Previously in 2008, in line with the same policy considerations addressed above, the South Korean government separated the governorship of FSS from the previous concurrent holding of head offices of both FSC and FSS.

28

73.    Regardless of whether the South Korean Embassy made a false representation—based on FSS's fraudulent presentation to it—with regard to the legal status of FSS to this Court in 2005, it is abundantly clear that since 2009, there is and can be no dispute that FSS is a pure civil corporation, not a government organ of South Korea. As such, the Second Circuit Court's holding in 2007, addressed in paragraph 66 above, has no preclusive effect on the legal status of FSS after 2009.

## FSS's Continued Obstructionist Conduct In This Court

74.    Since the designation of FSS as a "public institution" was revoked in 2009, Han and Park have continuously urged FSS and other relevant South Korean authorities such as MOFAT and FSC to rectify FSS's legal status as a government organ of South Korea in the United States so that Plaintiff can resume her action against Hankook Party. However, none have complied with these legitimate requests without any valid excuse for their refusal. Indeed, such refusal was because of subtle, yet unmistakable political reasons—Myung-Bak Lee ("MB Lee"), the father-in-law of Hyun-Bum Cho, became the president of South Korea in 2008, and soon after, Yoon was also appointed as the Minister of MOFAE. This situation adversely or at least considerably hindered, Plaintiff's efforts to seek remedies in this matter throughout MB Lee's five year tenure as president of South Korea.

75.    On June 9, 2017 Han filed her declaratory judgment action with this Court, earnestly seeking to obtain discovery from FSS in order to resume her cause of action against Hankook Party. Especially, in the new action, Han unequivocally put FSS on notice that if FSS continues to delay or hamper the resolution of her cause of

action against Hankook Party by falsely asserting that it is a government organ of South Korea, Han may claim monetary damages against FSS. Nonetheless, FSS filed a motion to dismiss Han's complaint on the primary ground that it is a government organ of South Korea, which entitles it to enjoy foreign sovereign immunity.

76.    On August 22, 2017, this Court referred Han's declaratory judgment case to the Magistrate Judge Barbara Moses for the purposes of general pretrial and dispositive motions. On October 6, 2017, reasoning that Han's declaratory judgment action to seek a ruling as to the outcome of a discovery motion not yet made, concerning a subpoena not yet issued or served, by means of which Han intends to seek document and deposition discovery from FSS is premature, the Magistrate Judge issued a report recommending that Han's declaratory judgment action be dismissed for lack of subject matter jurisdiction without prejudice—without addressing the foreign sovereign immunity issue, that is, the primary issue FSS raised in its motion to dismiss.

77. On or about September 20, 2017, pointing out the lax management at FSS, the Board of Audit and Inspection of South Korea notified the Governor of FSS that he was required to produce a plan to reorganize and close overseas offices. A correct copy of relevant portion of a news article published by Kukinews on September 21, 2017, immediately followed by an English translation, is attached hereto as **Exhibit J**. This possibility of FSS's closure of its United States offices including one in Washington, D.C. meant that Han might no longer pursue her claims against FSS in

the United States jurisdiction.[1]  It may be especially true when considering that Han's declaratory judgment action in this Court might be dismissed for lack of subject matter jurisdiction without prejudice—and on February 8, 2018, this Court actually dismissed the declaratory judgment action adopting the Magistrate Judge's recommendations. (*See* **Exhibit K** attached hereto). In light of the exigent circumstances set forth above, on January 18, 2018, Han filed a damages action against FSS asserting claims for tortious interference with contract and New York prima facie tort (the "Damages Action") with the United States District Court for the District of Columbia (the "D. C. Court").

### FSS's Continued Fraudulent Conducts In The D.C. Court.

78. In the Damages Action, on March 2, 2018 FSS again filed a motion to dismiss on the grounds, *inter alia*, that FSS is entitled to foreign sovereign immunity as an organ of the South Korean government and the D.C. Court therefore lacks subject matter jurisdiction; and that FSS's activities in D.C. are insufficient for it to be subject to personal jurisdiction of the D.C. Court.

79. Again, to support its alleged entitlement to foreign sovereign immunity, along with its motion to dismiss FSS submitted a document issued by FSC that FSS procured to prove that it is an organ of the South Korea government, satisfying the five factors of the Filler test—among which, this Court previously found in 2005, FSS "only met the first factor with any certainty." (*see* paragraph 55 above; *see also* p.2, Exhibit A). Said document issued on July 17, 2017 by FSC to FSS (the "FSC Document")—that in the declaratory judgment action commenced by Han in 2017

---

1 In March 2021, FSS closed down its Washington, D.C. office.

(*see* paragraph 75 above) FSS also submitted to this Court in support of its motion to dismiss— is attached hereto as **Exhibit L**.

80. In the Damages Action in the D.C. Court, Han disputed the validity of the FSC Document regarding FSS's status as an organ of the South Korean government. On or about September 12, 2019, on behalf of Han and himself, Park[2] phoned and had telephone conversations with two officials in charge of designation of public institutions, serving in Public Policy Bureau of MOFAE[3]: Chief Sang-Yung Lee and Deputy Director Yeon-Jung Yoo ("Yoo"). (*See* Park Declaration ("Park Decl.") ¶ 4, filed with the D.C. Court on September 23, 2019, which is attached hereto as **Exhibit M**). Park informed Yoo of the FSC Document purporting to conclude that under the Act of the Management of Public Institutions (the "Management Act") FSS is deemed as an organ of South Korean government notwithstanding its deferral under the Management Act, and that the South Korean government treats FSS as a government entity in South Korea. (*Id*.). Yoo replied that: "it is not true. FSS is not a government entity in Korea. FSS is a pure civil institution. Our office will consider responding to any discovery request to correct this finding if the U.S. court formally requests. I will prepare a written report on this development in the U.S. court." (*Id*.).

81. In the Damages Action, Han sought discovery on the slush funds at issue in this action through Hague Evidence Convention to which the United States is a contracting party in order to prove unlawful acts of FSS acting in concert with Hankook Party. To this end, on September 16, 2019, Park sent an email to Yoo with

---

2 Park is a South Korean national residing overseas; thus he enjoys a right to petition South Korean government under the relevant South Korean civil petition statute.
3 The current name of MOFAE is the Ministry of Strategy and Finance.

two documents in pdf file (the Report and Recommendation, and Financial Statements

2007 Fortis Bank). (*Id*. ¶ 5, <u>Exhibit 1</u>) The email reads:

> Dear Deputy Director Yoo,
>
> Please be kindly requested to forward this to Chief Sang-Yung Lee.
> The first attachment is a document issued by the U.S. court on September 9. Since it contains more than 60 pages, you may need my explanation regarding this document.
>
> My point is that on page 235 in the second attachment, Fortis Bank material, 4.9 % Fund 5818 Snowdon-Mast B.V. can be ascertained.[4]
>
> Thus, from this Snowdon trust account at Fortis Bank, evidence showing that Hankook Tire's slush funds were transformed into Myung-Bak Lee's may be obtained. In addition, this bank account may relate to Sun-Sil Choi's funds that were sent to Germany via  Netherland.
>
> But the only means to trace flows of money transfers therefrom is through the Hague Evidence Convention (to which the United States, Netherland, Luxemburg and Germany are contracting parties). Now, if the legal action in the U.S. court is dismissed, the appellate procedure takes long and thus it may become impossible to timely trace the funds transfers and procure any evidence relating to such transfers. I think that the Ministry of Strategy and Finance is responsible for this result.
>
> Namely, the Ministry of Strategy and Finance is responsible for conniving at FSS's making a false claim that FSS is a government entity under the Act of the Management of Public Institutions.
>
> End.

---

4 The Complaint identifies Snowdon-Mast B.V. ("Snowdon") as an entity in the European tax haven area that is holding slush funds formed by insider stock trading for the benefit of Mr. Cho and Hyun-Bum Cho. (*see* paragraph 44 above). Park recently located the bank account of Snowdon at Fortis Bank in Netherland. (*See* <u>Exhibit M</u>-Park Decl., p.11). Park has obtained information to estimate the amount of funds held by Snowdon and the other two entities to be roughly $160 million as of 2007. (*Id*. ¶ 6). Park discovered some evidence showing a high possibility that funds held in Snowdon were transferred to an entity controlled by MB Lee. (*Id*.).

No Joon Park

(*Id*. at p.11).

82. A few days after FSS submitted to this Court the FSC Document on July 17, 2017, Park called and spoke with Deputy Director Hye-Yeong Nah ("Nah") of FSC, whose name appears on the FSC Document, on the phone about the FSC Document. (*Id*. ¶ 7). Park asked Nah why she did not give a direct answer to the fifth factor of the Filler test: How FSS is treated under South Korean law (*See* Exhibit L, p.2).[5] (Exhibit M-Park Decl. ¶ 7). Nah replied that it was because FSS is not a government entity in South Korea. (*Id*.). Park also asked Nah about the FSC Document's answers to other factors of the Filler test: Park asked Nah if she would agree on his contention that the FSC Document's answers to such factors are false or misleading because they omit to state material facts concerning features of FSS as a civil organization, which renders the answers false or misleading. (*Id*.). Nah replied that she agreed with Park. (*Id*.). She added that she would consider correcting the statements contained in the FSC Document if FSC receives a formal discovery request from this Court. (*Id*.).

83. On or about September 14, 2018, Park received via email MOFAT's reply to his e-People civil petition requesting, among others, that MOFAT[6] make a report to the judicial authorities regarding FSS's fraudulent representation in the legal proceedings in the United States that it is an organ of South Korean government. (*Id*. ¶

---

5 With regard to the fifth factor, the FSC Document states that "[a]lthough the FSS has been continuously deferred the public institution designation under the Act on the Management of Public Institution since 2009, the deferral does not affect any of the four aforementioned statements." (*Id*.).

6 The current name of MOFAT is the Ministry of Foreign Affairs.

15, <u>Exhibit 8</u>, pp.42~43; *see also* <u>Exhibit 9</u>, pp.47~48) The MOFAT reply suggested

that Park should contact the Audit and Inspection Department of MOFAT. (*Id*.).[7]

84. On or about December 21, 2018, Park spoke with Sang-Soon Park, the

Chief of Special Inspection Office of MOFAT, on the phone. (*Id*. ¶ 16) The Chief told

Park that he contacted the legal team of FSS a few days ago; and that he asked them to

come to his office and explain FSS's grounds for its claim that FSS is a government

entity of South Korea, but the FSS legal team refused to comply with his request,

explaining that FSS, in fact, never said that it is a government entity of South Korea,

but **FSS's U.S. counsel made such claim as a litigation strategy in the legal

proceedings**. (*Id*.) (emphasis added). The Chief further advised that Park himself file

a criminal complaint against any employees of FSS or any government officials,

including those working in MOFAT, who were involved in the fraudulent

representation that FSS is a government entity of South Korea. He added that because

FSS is a pure civil organization and employees of FSS are civilians, there was nothing

he could do to stop FSS from conducting unlawful acts. (*Id*.).

85. On July 5, 2022, adopting a Magistrate Judge's Report and

Recommendation only as to the portion on personal jurisdiction, the D.C. Court

dismissed the Damages Action without prejudice, finding that "the site of Ms. Han's

injury may well be New York...but it is certainly not D.C." (internal quotation marks

---

7 The MOFAT reply mentions illegal activities of Yang-Ho Cho, the former
Chairman of Korean Air. (*Id*., <u>Exhibit 8</u>, p.43). Yang-Ho Cho's such activities relate to
the slush funds addressed above; it is alleged in Park's petition that after Yang-Ho Cho
acquired information to locate such funds, he negotiated with MB Lee, the former
President of South Korea, and with the full support from the South Korean
government, Cho obtained the right to operate Naboi Airport in Uzbekistan to
transport military supplies to the frontlines in Afghanistan during the Afghanistan War.

and citation omitted) (*See* the D.C. Court's Memorandum Opinion and Order, dated July 5, 2022, which is attached hereto as **Exhibit N**, pp.1, 9-10).

**FSS's Refusal of FSC's Demand Or Request to Investigate Hankook Party**

86. On November 26, 2019, pursuant to relevant South Korean laws and regulations Park filed with FSC a whistle-blowing regarding the slush funds at issue in this case. After reviewing Park's evidence proving Hankook Party's fraudulent accounting involving such slush funds for about one year, on numerous occasions FSC demanded or requested FSS to investigate Hankook Party's breach of laws and regulations relating to accounting and related public disclosure. (Two of such demands or requests are attached hereto as **Exhibit O**) However, to date, for more than two years, FSS has been refusing to comply with FSC's demand or request without any valid reasons. [8] On information and belief, like Yoon during 2005~2007, Bok-Hyeon Lee, a former prosecutor and the current Governor of FSS (appointed in June 2022), has been instructing employees of FSS to reject such demand or request.

87. Finally, on June 14, 2023, Park, along with Won-Gu Ann (witness in Park's whistle-blowing with FSC), met with Jung-Ho Moon, Bum-Jun Cho and Kyung-Jun Kim of FSS, who are team members of Accounting/Audit Division 1 in charge of said whistle-blowing in FSS's head offices in Seoul, South Korea. Astonishingly, Jung-Ho Moon notified Park that FSS may elect not to investigate Hankook's fraudulent accounting entailing the slush funds at issue in this case because evidence Park submitted tends to prove that the slush funds kept off of Hankook's

---

[8] Specifically, recently in 2023, as to the breach of public disclosure requirement, San-Wan Oh and Dong-Gu Park of FSS rejected FSC's such demand or request; and as to the fraudulent accounting, Mok-Hee Lee and Jung-Suk Yoon did the same.

accounting books and record belong to Mr. Cho and Hyun-Bum Cho, not Hankook—which thus means Hankook did not violate any accounting standards or rules. This notification is the exact opposite position or finding of FSS since 2002 that the offshore operations were for the benefit of Hankook, rather than for Mr. Cho personally (*see* paragraphs 32 and 33 above); indeed, it rather confirms, as Han alleges in the Complaint, FSS's money-laundering in 2002 of Mr. Cho's illicit funds into Hankook's balance books to free Mr. Cho from a heavy criminal punishment for various severe violations such as insider stock trading and concealing proceeds of crimes in tax haven areas.

88. As the recent development described in paragraphs 86 and 87 above clearly indicates, having ascertained that the collusive links between FSS and the *chaebol* (a large family-owned business conglomerate in South Korea) such as Hankook Party—which is the gravamen of this case—will continue to exist so that no amicable resolution of this case is feasible, Han files this damages action with this Court.

### COUNT ONE: Tortious Interference With Contract

89. Plaintiff incorporates by reference the allegations set forth above as if fully set forth herein.

90. The Indemnity Agreement validly executed by Plaintiff and Hankook Party exists. It contains a survival clause as a contractual statute of limitation with no expiration of indemnification obligation until fulfilled or discharged.

91. At all times material hereto, Defendant was aware that the Indemnity Agreement exists between Plaintiff and Hankook Party, and that the deciding issue in

Plaintiff's cause of action against Hankook Party is whether Defendant found that the Ocean transactions were in violation of laws or regulations of South Korea.

92.     Defendant has continued to intentionally and improperly interfere with the Indemnity Agreement by inducing or otherwise causing Hankook Party not to honor its indemnity obligations or intentionally procuring Hankook Party's breach of the Indemnity Agreement without justification. In doing so, Defendant was motivated by ill will, spite, hostility, or deliberate intent to harm Plaintiff.

93.     There would not have been a breach of Indemnity Agreement by Hankook Party but for the activities of Defendant.

94.     Defendant's continuing acts persisted up through the time of filing of this lawsuit. Plaintiff's claim possesses a continuing nature. As such, Defendant's ongoing course of action described above has inflicted continuing harm to Plaintiff. Accordingly, under continuous violations doctrine, Plaintiff is entitled to recover the totality of the harm Plaintiff suffered during the entire period in which the Indemnity Agreement has remained breached. Thus, as a result of Defendant's continuous tortious interference with the Indemnity Agreement, Plaintiff has suffered damages from the cumulative expenses, including but not limited to legal expenses, and other continuing harm caused by the unresolved claim. To date, Plaintiff has incurred legal and other expenses—excluding the damages to her business—that are subject to indemnification under the Indemnity Agreement in the amount of approximately $2.5 million.

## COUNT TWO: New York Prima Facie Tort
## (Alternative to COUNT ONE)

95.    Plaintiff incorporates by reference the allegations set forth above as if fully set forth herein.

96.    Defendant without excuse or justification—motivated solely by malicious intention to injure Plaintiff—embarked and continues to embark on a deliberate malicious vendetta against Plaintiff aimed at securing revenge for Plaintiff's bringing to light the pervasive corruption within Defendant's organization by obstructing Plaintiff's proof of her cause of action against Hankook Party.

97.    Defendant's continuing acts persisted up through the time of filing of this lawsuit. Plaintiff's claim possesses a continuing nature. As such, Defendant's ongoing course of action described above has inflicted continuing harm to Plaintiff. Accordingly, under continuous violations doctrine, Plaintiff is entitled to recover the totality of the harm Plaintiff suffered during the entire period in which the Indemnity Agreement has remained breached. Thus, as a result of Defendant's continuing acts—although they may not constitute outright unlawful acts—described above, Plaintiff has suffered damages from the cumulative expenses, including but not limited to legal expenses, and other continuing harm caused by the unresolved claim. To date, Plaintiff has incurred legal and other expenses—excluding the damages to her business—that are subject to indemnification under the Indemnity Agreement in the amount of approximately $2.5 million.

## COUNT THREE: Intentional Infliction Of Emotional Distress

98. Plaintiff incorporates by reference the allegations set forth above as if fully

set forth herein.

99. FSS has acted in a manner that is extreme, outrageous, intentional, willful, and grossly reckless, and for the purpose of causing serious and substantial emotional distress to Han and her family and/or in reckless and wanton disregard for same.

100. Because of FSS's retaliatory acts, Han and her family have been unable to get back to investment management business. Moreover, due to FSS's extreme and outrageous conduct such as perpetrating a fraud on courts including this Court by fraudulently claiming that FSS, a civil organization, is an organ of South Korean government in legal proceedings to hamper and/or delay the resolution of this case, Han has continued to feel angry and suffered from significant anxiety throughout this prolonged litigation between the parties.

101. As a result of the foregoing, Han has in the past, and will in the future, suffer damages, including but not limited to, depression, severe mental anguish, emotional distress, loss of enjoyment of life, as well as related pain and suffering from physical symptoms.

WHEREFORE, Plaintiff prays for relief as follows:

A.    Judgment awarding compensatory damages in favor of Plaintiff and against Defendant in an amount, which exceeds $75,000.00, to be determined at trial;

B.    Judgment awarding punitive damages against Defendant in an amount to be determined at trial;

C.    Awarding costs, expenses and attorneys' fees (as the case may be) as allowed by law; and

40

D.    Any other and further relief which the Court may deem just and

proper.

## **RESERVATION OF RIGHTS**

Plaintiff reserves her right to amend this original Complaint to assert any additional claims for relief against Defendant or other parties as may be warranted under the circumstances and as allowed by law.

## **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury in this action of all issues so triable.

RESPECTFULLY SUBMITTED this 27th day of June, 2023.

/s/ Karen C. Han
Karen C. Han, *pro se*
2317 Gray Dr.
Northlake, TX 76247-2074
karenh514@gmail.com
Phone) 972-672-7480

*Plaintiff proceeding pro se*